2003-NMCA-001

62 P.3d 320

**Stephen T. RICHARDS,**
**Plaintiff–Appellee,**

v.

**ALLIANZ LIFE INSURANCE COM-**
**PANY OF NORTH AMERICA,**
**Defendant–Appellant.**

No. 22,093.

Court of Appeals of New Mexico.

Oct. 7, 2002.

Certiorari Denied, No. 27,791,
Dec. 17, 2002.

Lawrence M. Pickett, Pickett & Murphy, Las Cruces, NM, for Appellee.

Stephen S. Hamilton, Jeff L. Martin, Montgomery & Andrews, P.A., Santa Fe, NM, Barbara P. Berens, Jennifer L. Frisch, Kelly & Berens, P.A., Minneapolis, MN, for Appellant.

## OPINION

BUSTAMANTE, Judge.

{1} Appellee, Stephen T. Richards (Richards), was a long-time agent for Allianz Life

Insurance of North America (Allianz). A dispute arose between them concerning commissions due Richards. Allianz filed a demand for arbitration of the issue. In response, Richards filed an application with the district court to stay the arbitration asserting that the agreement relied upon by Allianz was not enforceable against him. Allianz appeals from the district court's judgment granting Richards' application and denying Allianz's motion to compel arbitration. We have jurisdiction to hear the appeal under NMSA 1978, § 44–7–19 (1971)[1] of the Uniform Arbitration Act, NMSA 1978, §§ 44–7–1 to –22 (1971).

{2} Allianz argues that (1) the district court should have allowed an arbitrator to decide the validity of the arbitration clause in the first instance; (2) the district court erroneously determined that Allianz failed to satisfy the pre-termination notice provisions of the two 1960s contracts that had preceded the 1996 agreement containing the arbitration clause; (3) the 1996 agreement superceded the 1960s contracts, or at least modified them, for purposes of compelling arbitration; (4) Richards either waived his challenge to the enforceability of the 1996 agreement or modified the pre-existing contracts; (5) the 1996 agreement was not entered into as a result of duress; (6) the 1996 agreement is supported by consideration; and (7) the agreement is not voidable based on misrepresentation. We reverse and remand to the district court with instructions to enter a judgment granting Allianz's motion to compel arbitration.

## FACTUAL AND PROCEDURAL BACKGROUND

{3} Richards entered into an agent's contract with Fidelity Union Life Insurance Company (Fidelity) on June 20, 1966. This contract contained a provision allowing for termination by either party with a thirty day written notice. The 1966 contract also permitted modification if it was in writing and signed by two home office executives. In 1968 Richards entered into another contract with Fidelity, establishing him as a general

agent with the company. This contract contained a similar modification provision, but allowed for termination with a fifteen day written notice. Allianz purchased Fidelity in the 1970s, and assumed all of Fidelity's rights and obligations under the 1966 and 1968 contracts. Richards became disabled after a serious automobile accident in 1986, but continued to be classified as an active agent.

{4} Much of the dispute in the district court concerned the adequacy of notice to Richards under the termination provisions of the 1966 and 1968 contracts. Allianz's evidence was that it began in 1994 to disseminate notices informing its agents that all existing agent contracts would terminate on December 31, 1995. Richards denied he received any notice of termination of the 1960s contracts prior to December 21, 1995. The district court resolved this factual dispute in Richards' favor. Allianz argues there is no substantial evidence to support this finding, but we disagree. Thus, our analysis of the case will assume that Richards first received effective notice of the termination of his 1960s agent's contracts on December 21, 1995.

{5} The December 21 notice was prompted by a telephone conversation between Richards and an Allianz manager a few days earlier. The Allianz manager informed Richards that he would lose access to information and materials necessary to service his policyholders if he did not execute a new "service agreement" with Allianz. The new service agreement was enclosed with the December 21 notice of termination. The district court found that Richards signed the service agreement under duress on December 28, 1995. The effective date of this service agreement was January 1, 1996, (the 1996 agreement).

{6} In May 2000 Allianz filed an arbitration claim after a dispute developed over commissions. Richards responded by filing in the district court an application to stay arbitration. Although Richards initially maintained that he had never signed the 1996 agreement, he thereafter admitted he had

---

1. We note that the 1971 version of the Act was repealed effective July 1, 2001, and replaced with another version. *See* NMSA 1978, §§ 44–7A–1 to –32 (2001). Because all matters, including the notice of appeal, pre-date the effective date of the 2001 Act, we apply the 1971 Act.

signed it but took the position that the agreement failed to comply with the notice provisions of the 1960s contracts, lacked consideration, and was signed under duress. The district court agreed with Richards on all of these points, and this appeal followed.

## DISCUSSION[2]

### A. Deciding Arbitrability in the First Instance

■ {7} Allianz maintains that the following language in the 1996 agreement required the issue of arbitrability to be decided in arbitration in the first instance: "Any controversy or claim arising out of or relating to this Agreement, including its interpretation, validity, scope and enforceability, or the breach of its terms, will be settled by arbitration."

{8} Relying on *Shaw v. Kuhnel & Assocs., Inc.*, 102 N.M. 607, 698 P.2d 880 (1985), the district court ruled that the issue of arbitrability is a matter for the courts to decide. In *Shaw,* our Supreme Court took the opportunity to clarify the district court's role in addressing arbitrability. Looking at the language of the Act, and in particular Section 44–7–1, the Supreme Court concluded that:

> an arbitration clause is enforceable and valid *unless* there are legal or equitable grounds for revoking it. It would be ridiculous and contrary to the statutory language to require parties to arbitrate an issue of fraud in the inducement only to have the arbitration clause declared invalid if such fraud is found to exist by the arbitrator.

*Shaw,* 102 N.M. at 608–09, 698 P.2d at 881–82. As *Shaw* notes, Section 44–7–2(A) specifically gives courts the power to determine the validity of an arbitration clause. *Shaw,* 102 N.M. at 609, 698 P.2d at 882. Allianz argues that parties should be free to contract away this statutory provision. However, this argument must assume that the contract is valid in the first place. If the contract is not valid, as alleged here, then the "ridiculous"

scenario referred to in *Shaw* plays out. *See id.* at 608–09, 698 P.2d at 881–82.

{9} Allianz also maintains that *Shaw* was limited to situations involving fraud. Allianz supports this claim by referring to the second sentence quoted above. However, the reference to fraud merely reflects the facts of that particular case. *Id.* at 608, 698 P.2d at 881 (noting that the plaintiffs challenged the validity of the contract, and hence arbitrability, based on fraud). Allianz's position overlooks the first sentence of the above-quoted language and the underlying rationale of the analysis; i.e., that legal and equitable challenges to the validity of a contract and the arbitration clause contained therein are matters for the courts to decide in the first instance. *Accord Guar. Nat'l Ins. Co. v. Valdez,* 107 N.M. 764, 766–67, 764 P.2d 1322, 1324–25 (1988). Accordingly, we affirm the district court's decision to decide arbitrability.

### B. Satisfying the Termination Provisions of the 1966 and 1968 Contracts

{10} The district court found that Allianz failed to properly terminate the 1966 and 1968 contracts in two respects: by failing to give adequate notice and by failing to have two Allianz representatives' signatures on the 1996 agreement. Most of the briefing in this appeal concerns these findings. However, as discussed below, we conclude that the 1996 agreement constituted a substitution of the earlier contracts; as a result, there is no need to decide whether notice and other technical termination provisions were satisfied. The issue does, however, become relevant for purposes of the economic duress analysis. For purposes of analysis, we assume, without deciding, that the district court's findings with respect to notice are supported by substantial evidence.

### C. Substitution

■ {11} The district court's decision that the 1996 agreement "is not valid and is unenforceable" is based on two distinct grounds.

**2.** We note that Allianz extensively used footnotes throughout its brief in chief and reply brief, apparently as a means of avoiding our page limitation stricture. Counsel for Allianz are hereby instructed to avoid the extensive use of footnotes in the future. *See Schmidt v. St. Joseph's Hosp.,* 105 N.M. 681, 685, 736 P.2d 135, 139 (Ct.App. 1987) (extensive use of footnotes is contrary to the spirit of our rules and should be discouraged).

Apparently determining that Richards was forced into a new contract that provided him no new benefits, the district court accepted economic duress and lack of consideration as good defenses to the validity of the 1996 agreement. The district court's other reason for invalidating the 1996 agreement was that it failed to comply with the termination and amendment provisions of the 1960s contracts. The two approaches are different in work and effect. The latter is viable only if the 1996 agreement cannot be seen as a substitute for the 1960s contracts. The former are potentially viable whether the 1996 agreement is considered a substitution or not. Thus, our analysis will first address whether the 1996 agreement was intended as a substitute for the 1960s contracts. If it was, the technical requirements of the earlier agreements, such as notice and signature, do not govern and are relevant only insofar as they pertain to Richards' other defenses.

■ {12} Parties to a contract may substitute a prior agreement with a new one. *See* Restatement (Second) of Contracts § 279 (1981) (hereinafter Restatement); Arthur Linton Corbin, *Corbin on Contracts* § 1293 (1962) (hereinafter Corbin). As noted by our federal district court,

> This doctrine, the substitution of contracts, has been characterized in New Mexico as the doctrine of merger. Both stand for the proposition that, in the case of subsequent inconsistent contracts, the later contract governs. *See Superior Concrete Pumping, Inc. v. David Montoya Const., Inc.*, 108 N.M. 401, 404, 773 P.2d 346, 349 (N.M.1989) ("The doctrine of merger is a contract principle that prior agreements on the same subject are presumed to be included in the final contract. Merger applies only to successive agreements that contain inconsistent terms. Under these conditions, an antecedent agreement is deemed to have merged into the more recent contract[.]" (citations omitted)).

*K & V Scientific Co. v. Bayerische Motoren Werke Aktiengesellschaft (BMW)*, 164 F.Supp.2d 1260, 1263 n. 2 (D.N.M.2001). In this opinion we prefer to use the term "substitution," since it appears to be the uni- versally-accepted term and "merger" more typically applies to deeds. *See El Sol Corp. v. Jones*, 97 N.M. 645, 646–47, 642 P.2d 1104, 1105–06 (1982) (discussing origins of merger doctrine in New Mexico).

{13} The issue of whether a new contract is intended to govern over a prior agreement is answered by the same analysis that applies to the enforceability of any contract. *Corbin, supra* at 188. Here, the 1996 agreement contains two provisions that trigger substitu- tion:

10. **BINDING EFFECT.** This Agree- ment will be binding upon and will inure to the benefit of the heirs, per- sonal representatives, successors, and, where permitted, assigns of the parties. This Agreement supercedes any and all other agreements either written or oral between the parties and may be changed or modified only by an instrument in writing signed by the parties and dated subsequent to the date indicated on the first page of this Agreement, except as otherwise provided in this Agreement.

. . . .

12. **CONFLICT.** To the extent that this agreement conflicts with prior agree- ments, if any, between these parties this agreement and its provisions will prevail and control.

{14} The 1996 agreement unambiguously contemplates that it is a substitute for the 1960s contracts. Notwithstanding this clear and unambiguous language, Richards takes the position that the 1996 agreement could only be enforceable if Allianz first fully com- plied with the provisions of the 1960s con- tracts. This approach is erroneous because, contrary to settled New Mexico law, it fails to recognize the effect of the doctrine of substitution. *See generally Germany v. Murdock*, 99 N.M. 679, 662 P.2d 1346 (1983); *W. Petroleum Co. v. Atl. Ref. Co.*, 68 N.M. 149, 359 P.2d 773 (1961); *Amarillo Hard- ware Co. v. McMurray*, 15 N.M. 562, 110 P. 833 (1910). The argument ignores the par- ties' ability to change their arrangement and obviate prior agreements. As the Restate- ment observes, the situation here is typical: "A common type of substituted contract is

one that contains a term that is inconsistent with a term of an earlier contract between the parties. If the parties intend the new contract to replace all of the provisions of the earlier contract, the contract is a substituted contract." Restatement § 279 cmt. a.

{15} The impact of substitutions is clear with regard to technical procedures in the prior contracts such as the double-signature requirement. Where the effect of the transaction is not simply to amend but to replace the former agreement, provisions addressing simple adjustment of the former agreement do not control the mechanics of substitution unless the parties agree otherwise.

{16} The same rationale applies to the termination provisions of the 1960s contracts. The December 21 notice of termination was not totally ineffective, as Richards argues and the district court apparently believed. While the December 21 notice could not terminate the 1960s contracts as of December 28; applying the erroneous date rule, it would be effective as of January 5th and 20th, respectively. *See Shain v. Wash. Nat'l Ins. Co.,* 308 F.2d 611, 614 (8th Cir.1962) (describing the general rule "that where a contract, ... requires written notice of cancellation upon a stated time, a notice failing to meet the time requirement, but otherwise appropriate, is nonetheless effective upon the lapse of the time required by the contract"); *see also Lyon v. Pollard,* 20 Wall. 403, 87 U.S. 403, 407, 22 L.Ed. 361 (1874) (mem.); *G.B. Kent & Sons, Ltd. v. Helena Rubinstein, Inc.,* 47 N.Y.2d 561, 419 N.Y.S.2d 465, 393 N.E.2d 460, 462 (1979); *Promark Group, Inc. v. Harris Corp.,* 860 P.2d 964, 967 (Utah Ct.App.1993).

{17} Thus, the failure by Allianz to give Richards the thirty and fifteen day notices of termination required by the 1960s contracts would not by itself void the 1996 agreement if it was otherwise enforceable—that is, if Richards did not prevail on the duress or lack-of-consideration defenses. Absent a defense to the formation of a contractual relationship, at least as of the time the 1960s contracts terminated, Richards' agreement with Allianz was either controlled by the 1996 agreement or he had no agreement at all.

We now turn to the duress and lack-of-consideration questions.

## D. Richards' Defenses to the 1996 Agreement

{18} The district court agreed with Richards' argument that "there was inadequate consideration for" the 1996 agreement and that it was the product of economic duress. Allianz challenges each of these grounds, and we consider them in turn.

### Consideration

{19} The district court's conclusion that the 1996 agreement lacked consideration is based on its finding that the 1996 agreement did not give Richards anything more than he already had. Allianz asks us to set aside the court's ruling because the court stated that there was "inadequate" consideration, as opposed to saying that the agreement "lacked" consideration. As Allianz notes, you either have consideration or you do not, and the amount of consideration is not an issue. *Western Bank v. Biava,* 109 N.M. 550, 552, 787 P.2d 830, 832 (1990). However, under our standard of review, we read any ambiguity in favor of the judgment. *Cf. Herrera v. Roman Catholic Church,* 112 N.M. 717, 721, 819 P.2d 264, 268 (Ct.App. 1991) ("Unless clearly erroneous or deficient, findings of the trial court will be construed so as to uphold a judgment rather than to reverse it.").

{20} We agree with Allianz's reasoning with respect to the merits of the issue. Specifically, consideration is found in the continuation of the insurer/agent relationship. Richards does not dispute that Allianz had the right to terminate the 1960s contracts. The district court's approach—that there is no consideration because he did not get anything more than he already had—was erroneously based on case law holding that a promise to do what one already must do does not constitute consideration. *See, e.g., Jaynes v. Strong–Thorne Mortuary, Inc.,* 1998–NMSC–004, ¶¶ 10–11, 124 N.M. 613, 954 P.2d 45 (discussing pre-existing duty rule); *Hale v. Brewster,* 81 N.M. 342, 345, 467 P.2d 8, 11 (1970). Here, there was no

unfulfilled prior obligation. Thus, the continuation of the relationship formed the requisite consideration.

**Duress**

{21} The key findings of fact upon which the district court based its conclusion of duress are:

13. That on December 18, 1995, Richards received a call from an agent of Allianz informing him that if he did not execute a proposed service agreement prepared by Allianz, he would lose all access to information regarding his policyholders, access to necessary materials and supplies for servicing his policyholders and access to the use of the Allianz watts line which is critical for servicing policyholders.

14. That without this accessible information and cooperation from Allianz, all agents of the company including Richards would lose their existing policyholders or vested interest arising out of their preexisting contracts.

. . . .

16. That Allianz enjoyed a superior bargaining position with Richards regarding the proposed 1996 Service Agreement.

17. That if Richards failed to execute the 1996 Service Agreement it would cause him economic loss based upon the vested interest in existing policyholders where he was collecting commissions.

18. That Allianz left Richards no alternative other than to sign the Service Agreement.

19. Allianz offered the 1996 Service Agreement to Richards on a "take it or leave it" basis.

20. That the 1996 Service Agreement contained an arbitration clause.

21. Neither the 1966 Agent's Contract or the 1968 General Agent's Contract of Richards contained an arbitration clause.

. . . .

23. That Richards received the proposed Service Agreement on December 21, 1995, with his first notice of termination of preexisting contracts and he signed the Service Agreement under duress on December 28, 1995, and returned it to Allianz.

{22} Allianz argues that these facts are insufficient as a matter of law to constitute duress because in terminating and replacing the 1960s contracts it was doing nothing more than what it was allowed to do. *See Lebeck v. Lebeck,* 118 N.M. 367, 374, 881 P.2d 727, 734 (Ct.App.1994) (affirming decision that a prenuptial agreement was not the product of duress because "[a] lawful demand or a threat to do that which the demanding party has a right to demand is not sufficient to support a claim of duress"). In Allianz's view, the fact that it had the right to terminate the 1960s contracts is enough by itself to override any irregularity in the process of termination and substitution as well as any objection Richards might have to the 1996 agreement.

{23} As we shall explain, Allianz's position significantly overstates the force of *Lebeck.* However, because we conclude there is no substantial evidence that Richards would have lost any vested interest even if he had not executed the 1996 agreement, we nevertheless agree there was no duress here.

{24} To reach our conclusion we must first analyze the district court's findings of fact to discern whether and how they can be construed so as to uphold the judgment. *Cf. Herrera,* 112 N.M. at 721, 819 P.2d at 268 ("Unless clearly erroneous or deficient, findings of the trial court will be construed so as to uphold a judgment rather than to reverse it.").

{25} The district court's findings of fact lend themselves to a number of interpretations. There is an explicit finding of superior bargaining position, bolstered by the findings that Richards had no alternatives in December 1995 other than to sign the proposed service agreement, or not sign it. The findings can also be construed to find fault with the timing of Allianz's demand for execution of the 1996 agreement; that is, that Richards was faced with a difficult decision carrying potentially severe economic consequences, and he was forced to make a decision within a short time frame. The district court clearly gave weight to the fact that Richards was forced to make his decision even before the

notice periods for termination of the 1960s contracts were complete. Finally, the findings emphasize the threat to Richards of losing "existing policyholders" and his "vested interest arising out of their preexisting contracts" if he did not sign the new agreement.

{26} We should also note what the district court did not find, and what cannot be found in its findings. The district court did not find that Allianz could not effectively terminate the 1960s contracts. Neither did the district court conclude that terminating the 1960s contracts would be wrongful, illegal, or a breach of the duty of good faith in and of itself. It only found that termination was not done correctly. In addition, the district court did not find that the terms of the 1996 agreement—in particular the arbitration clause—were inherently unfair or unconscionable.

{27} Whether the findings of fact support the conclusion of duress, of course, depends on the law of duress, to which we now turn.

{28} The theory of economic duress in New Mexico has generally followed development of the law in the United States as a whole. The earliest case concerned a soldier who re-enlisted in order to secure his release from the fort guard-house where he was imprisoned on valid charges. *McDonald v. Carlton*, 1 N.M. 172 (1857). The court upheld the trial court's denial of relief from the contract of re-enlistment under a definition of duress limited to "actual or threatened violence or restraint of a man's person, contrary to law ... sufficient to overcome the mind of a person of ordinary firmness." *Id.* at 176–77.

{29} In *Cadwell v. Higginbotham*, 20 N.M. 482, 151 P. 315 (1915) our Supreme Court affirmed a money judgment based on the "theory of duress of goods." *Id.* at 504, 507, 151 P. at 321 (holding that circumstances met standard of influencing the "apprehensions and conduct of a prudent business man," thus making "payment of money wrongfully induced thereby" not voluntary, quoting *Robertson v. Frank Bros. Co.*, 132 U.S. 17, 23, 10 S.Ct. 5, 33 L.Ed. 236 (1889) (internal quotation marks omitted)).

{30} The more modern cases in New Mexico have generalized the inquiry to ask as whether a person has been "coerced into [the transaction] by the wrongful act of another." *See Pecos Constr. Co. v. Mortgage Inv. Co.*, 80 N.M. 680, 682–83, 459 P.2d 842, 844–45 (1969) (affirming judgment for return of money paid where "trial court did not find that a bona fide dispute existed" to support a defense of a good faith settlement). The policy aim of the rule "is to discourage or prevent an individual in a stronger position, usually economic, from abusing that power ... in a bargain situation." *First Nat'l Bank v. Sanchez*, 112 N.M. 317, 320, 815 P.2d 613, 616 (1991); *Terrel v. Duke City Lumber Co.*, 86 N.M. 405, 422, 524 P.2d 1021, 1038 (Ct.App.1974), *aff'd in part, rev'd in part by*, 88 N.M. 299, 540 P.2d 229 (1975). Thus, the fundamental issue in duress cases is whether the statement which induced the agreement is the type of offer to deal that the law should discourage as oppressive and thus improper.

{31} New Mexico's current uniform jury instruction on duress takes a generic approach to the description of the concept. UJI 13–838 NMRA 2002 provides:

> If _____ entered into the contract under duress, then [he][she] is excused from performing [his][her] obligations under the contract.
>
> [_____ is duress, if under the circumstances it induces the other person to enter into a contract that [he][she] otherwise would not have entered into.]
>
> [Duress is intentional action by one person presenting such a serious business or financial loss or injury to the other person to the contract that he or she has no reasonable choice or alternative. _____ has the burden of proving duress by clear and convincing evidence.]

{32} The third paragraph is intended to cover "business duress." Viewed in the abstract, UJI 13–838 could be interpreted to put in jeopardy a wide range of hard, yet truly voluntary, bargains. To avoid too-broad an application of the rule, an important limiting factor is noted in the Committee

Comment. Citing to the Restatement (Second) of Contracts § 176 (1981), the UJI Committee Comment makes clear that the "conduct claimed to cause the duress must be wrongful, although not necessarily criminal." The comment also refers the interested reader to J. [sic] A. Farnsworth, *Contracts* §§ 4.16, 4.17, for a general overview of the modern approach to economic duress.

{33} Section 175 of the Restatement states the general rule that a contract is voidable if a "party's manifestation of assent is induced by an improper threat ... that leaves the victim no reasonable alternative." Restatement (Second) of Contracts § 175(1) (1981). Section 176 of the Restatement describes two broad types of "improper threats." Subsection (1) gives examples of threats which are per se improper.

(1) A threat is improper if

(a) what is threatened is a crime or a tort, or the threat itself would be a crime or a tort if it resulted in obtaining property,

(b) what is threatened is a criminal prosecution,

(c) what is threatened is the use of civil process and the threat is made in bad faith, or

(d) the threat is a breach of the duty of good faith and fair dealing under a contract with the recipient.

Restatement (Second) of Contracts § 176(1). This list of improper threats is similar to the examples of wrongful conduct found in the Committee Comment to UJI 13–838. These types of threats or wrongful conduct, if found to actually cause a party's assent to an agreement, will support a finding of duress without regard to the fairness of the resulting exchange. *Cadwell, Pecos,* and *Terrel* are examples of per se wrongful threats.

{34} The second type of threat described by Section 176 is different in that the impropriety of the threat is dependent to a degree on the fairness of the "resulting exchange."

(2) A threat is improper if the resulting exchange is not on fair terms, and

(a) the threatened act would harm the recipient and would not significantly benefit the party making the threat,

(b) the effectiveness of the threat in inducing the manifestation of assent is significantly increased by prior unfair dealing by the party making the threat, or

(c) what is threatened is otherwise a use of power for illegitimate ends.

Restatement (Second) of Contracts § 176(2). The comments to UJI 13–838 do not mention these types of improper threats. And, we have not found—and the parties have not cited—a New Mexico case considering this second type of improper threat. Because it can fruitfully be applied to resolve this case and appears well-grounded, we will consider it here.

{35} For purposes of argument, and to demonstrate that Richards cannot prevail on the most favorable construction of the record, we will only consider whether Allianz's actions, or threats, were improper. We, thus, assume that: (1) the statements constituted threats and were not mere descriptions of probable consequences of a course of action, *see Fox v. Piercey,* 119 Utah 367, 227 P.2d 763, 766 (1951), *as modified by Andreini v. Hultgren,* 860 P.2d 916, 920 (Utah 1993); (2) the statements actually caused Richards to sign the 1996 agreement; and (3) that the threat of losing contact with his clients' records was sufficiently grave to justify Richards' acquiescence in Allianz's demand that he sign the 1996 agreement prior to January 1, 1996.

{36} Under Section 176 of the Restatement, Allianz's threats were not improper. Allianz's acts clearly do not fit the first three examples of per se impropriety. The simple fact that Allianz sought to end the 1960s arrangements and replace it would not constitute duress absent some aggravating circumstance. Richards does not argue that terminating and replacing the 1960s contracts, if done correctly, would be wrongful in any way. He does argue that there are aggravating circumstances here; that is, the lack of timely notice to him and the loss of his vested interest in existing policies if he did not sign the new agreement. These two are not directly connected and are best considered separately.

{37} If Richards was threatened with the loss of a vested interest, duress might apply, even though in terminating the 1960s contracts, Allianz was doing what it could legally do. Here we part with the broad statement Allianz relies on from *Lebeck.* As Farnsworth notes, the doctrine of duress has progressed beyond the limits of torts and crimes, and today "a threat may be improper even though the one who makes it has a legal right to do the threatened act." E. Allan Farnsworth, *Contracts* § 4.17, at p. 275 (2d ed.1990); *see* Restatement § 176 cmt. e, f. Thus, while a threat by a party not to perform a contractual duty is not by itself improper, it may be found improper if combined with a threat which is extortionate, results in a forfeiture, or is made for purposes unrelated to the contract, such as inducing the recipient to make a separate contract. *See Laemmar v. J. Walter Thompson Co.,* 435 F.2d 680, 682 (7th Cir.1970) (holding that threat to fire at-will employees to force employees to sell their shares of employer stock constituted an allegation of duress sufficient to withstand a motion to dismiss on the pleadings); *McCubbin v. Buss,* 180 Neb. 624, 144 N.W.2d 175, 179 (1966) (finding business coercion where termination of employment threatened if stock-purchase contract not cancelled); *Mitchell v. C.C. Sanitation Co.,* 430 S.W.2d 933, 937 (Tex.Civ.App.1968) (finding duress where employer threatened to fire at-will employee if employee did not release his claim for personal injuries for an inadequate sum in order for employer to settle its claim for property damages against the same defendant). *But see Vines v. Gen. Outdoors Adver. Co.,* 171 F.2d 487, 490 (2d Cir.1948) (holding that requiring forfeiture of employee's prior earned commissions in exchange for continued employment did not constitute duress).

{38} We find no evidence that Allianz threatened Richards with the loss of any vested interest in the nature of commissions earned and payable on previously sold policies. Commissions earned under the 1960s contracts were vested and there is no indication that cancellation of the 1960s contracts

and replacement with the 1996 agreement would affect them in any way.

{39} It is true that termination of the 1960s contracts combined with a failure to replace them with the 1996 agreement would take away Richards' ability to service his policyholders in the future. We appreciate the seriousness of this threat to Richards. The ability to service and renew old policies is vital to the maintenance of an insurance salesman's income. Without the ability to service clients, Richards' policies would eventually dissipate either through neglect or replacement. However, there is no sense in which the ongoing or future right to continue servicing his policies can be deemed vested. *Shain* is instructive in this regard.

{40} In *Shain,* as noted above, the plaintiff asserted that the notice of termination of his insurance agent contract was not timely and thus entirely ineffective. The plaintiff argued in part that an untimely notice could not be used to deprive him of renewal and servicing rights because they were "substantial [ ] rights which he possessed." *Shain,* 308 F.2d at 616. In response, the Court, through then Judge Blackmun, stated:

> In addition, however, the right to solicit in the future was clearly not a 'substantial, subsisting right' similar to the earned rebates in controversy in *Oldfield.*[3] The same may be said of anticipated renewal commissions. It is true that upon termination of his general agency the renewal commissions thereafter accruing to the plaintiff were less than those he would have received had the agency continued. The difference was the increment paid the general agent. This is based, however, on the agency's servicing of insurance in force. It is payment for a service currently rendered and is not, as was the situation in *Oldfield,* an accumulation of amounts already earned by past services.

*Id.* (footnote added).

{41} Thus, termination of the 1960s contracts did not involve loss of such a vested interest as to result in a forfeiture. Under

**3.** *Oldfield v. Chevrolet Motor Co.,* 198 Iowa 20, 199 N.W. 161, 162 (Iowa 1924) (holding that a late notice of termination would not be effective

to prevent employee from receiving an earned bonus).

Section 176 of the Restatement, however, we must also inquire whether the resulting agreement is unfair. Richards does not argue that the 1996 agreement is unfair in any specific aspect. The provision most at issue here is, of course, the arbitration clause. Requiring arbitration in and of itself is not improper in this context. *See In re Hellenic Lines, Ltd.*, 372 F.2d 753, 758 (2d Cir.1967). Our review of the arbitration clause does not reveal any glaringly unfair provision betraying an improper exercise of superior bargaining power by Allianz. The only provision slanting toward Allianz is the requirement that hearings "will be held in Dallas, Texas[.]" This will likely be an inconvenience to Richards, but not enough to prompt us to further inquiry whether duress should be found.

{42} The final potential source of duress is the untimely notice issue. Allianz demanded that Richards sign the 1996 agreement before the notice periods under the 1960s contracts ran. Further, Richards had only a few days during the Christmas holiday to make his decision. We have no doubt that Richards suffered stress in those days. However, we do not believe that these circumstances rise to the level of duress. We have already noted that the 1996 agreement is not intrinsically unfair. In addition, apropos to the notice and short time frame, Richards cannot demonstrate more time would have added anything to his decision-making process. Had he received his notice of termination on November 30, 1995, or if he could have delayed the decision until January 22, 1996, Richards cannot show how the result would have been different. Under these circumstances, we hold that Allianz's demand that Richards execute the 1996 agreement before January 1 cannot be deemed sufficiently wrongful or improper to result in a finding of duress.

**CONCLUSION**

{43} We reverse the judgment of the district court and remand for proceedings not inconsistent with this opinion.

{44} IT IS SO ORDERED.

A. JOSEPH ALARID and JONATHAN B. SUTIN, Judges, (specially concurring).

ALARID, Judge (specially concurring).

{45} I wholeheartedly concur in the result reached by Judge Bustamante's opinion. I concur in the reasoning set out in Parts A and D of Judge Bustamante's opinion. I disagree with Parts B and C because I do not believe that this case involves a substituted contract.

{46} The critical error made by the trial court was its conclusion that the December 21, 1995, notice of termination had no effect, and therefore, the 1966 and 1968 contracts "remain valid and controlling." As Judge Bustamante points out, this legal conclusion is wrong. The December 21, 1995, notice was effective to terminate the 1966 and 1968 contracts within thirty and fifteen days, respectively.

{47} The concept of a substitute contract is important when there is a question of whether there was consideration to support the discharge of a duty owed under an existing contract. E. Allan Farnsworth, *Contracts* § 4.24 (2d ed.1990). In my view, there was no need for Allianz to offer anything to Richards to obtain his agreement to "discharge" Allianz from any duties owed to Richards under the 1966 and 1968 contracts because those contracts and any duties owed to Richards under those contracts were terminated by Allianz's exercise of the termination-at-will provisions contained in the 1966 and 1968 contracts. I view the 1996 agreement as a completely new contract supported by its own consideration (Allianz's agreement to employ Richards subsequent to the date that the 1966 and 1968 contracts terminated pursuant to the December 21, 1995, notice), rather than a substituted contract.

SUTIN, Judge (specially concurring).

{48} I concur. The 1996 agreement was substituted for the earlier agreements. Richards signed it and accepted its benefits without complaint for a considerable period of time. Any concern about a failure to properly terminate one of the earlier contracts becomes irrelevant upon the determination of substitution. Further, the earlier contracts were terminated at some point any-

way. Also, whether the 1996 agreement modified the earlier agreements also becomes irrelevant upon the determination of substitution. This leaves only lack of consideration and duress. On neither issue was there substantial evidence to support a finding which in turn would support a conclusion of lack of consideration or of duress.